Approved: _____ _____
MARTIN S. BELL / ROBERT L. BOONE
Assistant United States Attorneys

Before: THE HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York

**20 MAG 11830**

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :    **SEALED COMPLAINT**
                                 :
        - v. -                   :    Violations of 15 U.S.C. §§
                                 :    78j(b) & 78ff; 17 C.F.R.
TERRENCE CHALK,                  :    §§ 240.10b-5; 18 U.S.C. §§
    a/k/a "Terrence Cash,"       :    1343 and 2.
    a/k/a "Dr. Cash,"            :
                                 :    COUNTY OF OFFENSES:
        Defendant.               :    New York
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   KRISTIN ALLAIN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
**(Securities Fraud)**

   1.   From in or about 2017 through in or about October 2020, in the Southern District of New York and elsewhere, TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not

1

misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, CHALK, for the purpose of defrauding investing clients, concealed his true identity and sold clients an equity stake in a purported fund that would invest in companies to generate returns, but did not invest the money as promised.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

### COUNT TWO
### (Wire Fraud)

2.  From in or about 2017 through in or about October 2020, in the Southern District of New York and elsewhere, TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, CHALK, for the purpose of defrauding investing clients, and through the use of interstate wires, including emails and telephone calls to and from the Southern District of New York, concealed his true identity and sold clients an equity stake in a purported fund that would invest in companies to generate returns, but did not invest the money as promised.

(Title 18 United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

3.  I have been a Special Agent with the FBI for approximately three years.  I am currently assigned to a squad responsible for investigating violations of the federal securities laws and other financial criminal offenses.  I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

4.  The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by the

U.S. Securities and Exchange Commission ("SEC") and other business records. Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation. Where communications and events are referred to herein, they are related in substance and in part unless otherwise noted. Where dates, figures, and calculations are set forth herein, they are approximate.

### Summary of the Scheme to Defraud

5. Based on the information set forth herein, I respectfully submit that there is probable cause to believe that, beginning in or about 2017, TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, operated a fraudulent scheme in which he solicited investments using material misrepresentations and omissions concerning the nature of the investment, the use of the investment funds, and his own true identity. Among other things, CHALK, using the alias "Terrence Cash" to conceal a past financial fraud conviction, offered investors the opportunity to purchase an equity stake in an investment program called the "Chairman's Fund," run out of a group of companies collectively known as Greenlight, including Greenlight Investment Partners, Inc. and Greenlight Investment Circle, under which the funds were directed to specific investment opportunities with the promise of regular returns from those investments. In truth and in fact, CHALK did not invest the money as promised.

### Relevant Entities and Individuals

6. At all times relevant to this Complaint:

   a. TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, has run a Central Florida-based business called Greenlight Investment Partners, Inc. and several similarly named entities (together, "Greenlight" or "the Company") since approximately in or about 2015. CHALK has run these businesses under an alias, "Terrence Cash" (or "Dr. Cash"). Notably, on or about August 31, 2009, CHALK -- under his legal name -- was convicted in this District of identity theft and conspiring to make false statements to financial institutions, all in connection with a scheme to fraudulently obtain loans and lines of credit in the name of entities he controlled. Among other things, CHALK applied for loans using the identifiers of a dead relative, and continued -- from jail -- to direct the submission of fraudulent documents to a BMW car dealership after his initial arrest on those charges in order to

3

secure BMW automobiles for associates of his.  On or about January 28, 2010, he was sentenced to 76 months' imprisonment.  Since that time, evidence of his earlier conviction -- including press releases announcing both his guilty plea and sentencing by the United States Attorney's Office, which included the details mentioned herein -- have been readily available to Internet users who run searches for "Terrence Chalk" through commonly-used search engines.  Diligence on a "Terrence Cash" would not have revealed CHALK's prior conviction, or any readily apparent connection between "Cash" and CHALK.

        b.  Websites for the Company tout "Terrence Cash" as "the nation's No. 1 business, money, and wealth coach," and offer money management and wealth creation "coaching" -- teaching sessions in which "Cash" shares the "hidden secrets of the wealthy" to change his clients' "mindset, perspective, and relationship with money" so as to assist them in achieving positive financial outcomes.  They also note that "Terrence Cash" is the Chief Investment Officer of the Company's holding company, which offers investment opportunities through its "Chairman's Fund."  According to the websites, the Chairman's Fund purportedly represents a fund of funds[1] and offers participants in the fund consistent, quarterly cash payouts and high returns.

        c.  Individual-1 worked for the Company directly under CHALK from in or about 2017 to in or about 2020.  As set forth below, while working for the Company, she communicated with coaching customers and investors on CHALK's behalf.

        d.  Victim-1, Victim-2, and Victim-3 were investors in the Company between in or about 2017 and in or about 2020.  They were each, at various points, also coaching customers of CHALK's (under his alias), and were ultimately induced by CHALK to invest substantial amounts of their own funds into the Chairman's Fund.

### The Scheme to Defraud

7.  I have spoken to a person who invested in the Company ("Victim-1").  From my conversations with Victim-1, and from

---

[1] A "fund of funds" is a pooled investment fund that, rather than investing directly in stocks, bonds, or other securities, invests in other funds.  As set forth herein, the Company's investment program, though billed as a fund of funds, does not meet this description.

4

reviewing documents provided by Victim-1, I have learned, among other things, the following:

    a. Beginning in or about late 2016, Victim-1 began speaking to persons affiliated with the Company concerning potential investment services. Among the individuals she spoke to was a person ("Individual-1") whom she understood to be one of the Company's representatives, who provided her with literature related to the business. Victim-1 also began speaking to TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, who held himself out as Terrence Cash, the Chairman of the Company. Beginning in or about December 2017, CHALK and Victim-1 spoke regularly by phone, with Victim-1 speaking from her home in the Southern District of New York. In those conversations, CHALK offered what amounted to coaching and consulting sessions regarding investing.

    b. Beginning in or about the late summer or early fall of 2017, CHALK began offering Victim-1 private investment opportunities related to third-party businesses. For example, CHALK offered an opportunity to invest in a startup fleet of limousines managed by an associate of CHALK's, in which Victim-1 invested approximately $50,000.

    c. In the ensuing months, CHALK solicited additional investments from Victim-1. Victim-1 subsequently invested an additional amount approximating $300,000[2] in what CHALK told her was the Chairman's Fund. These additional investments represented substantially all of Victim-1's 401(k) retirement account. In order to invest in the Chairman's Fund, Victim-1 was instructed by CHALK to transfer money to a third-party entity ("Third Party Entity-1").[3] CHALK told Victim-1 that her investments into the Chairman's Fund would actually constitute the purchase of an equity share in the Company, the proceeds of which would go into individual ventures offered to her and selected by CHALK, triggering a guaranteed quarterly, fixed percentage return from those ventures. I have reviewed stock purchase agreements from the Company and investment authorization documents from Third Party Entity-1 that represent that Victim-1 was purchasing shares in the Company. Those documents did not identify which ventures would receive the invested funds from the Company.

---

[2] According to documents provided by Victim-1, and supporting documents provided by Third Party Entity-1, referenced further herein, these additional investments totaled $318,820.

[3] I know from having reviewed Third Party Entity-1's website that it has offices in South Dakota and New Jersey.

5

   d. Initially, Victim-1 did receive regular quarterly payouts from her investments, in the form of mailed checks. However, beginning in or about 2019, the payments became infrequent, and Victim-1 had difficulty obtaining explanations from the Company and its officers as to why she had not been paid as promised by CHALK.

   e. Shortly thereafter, Victim-1 learned that CHALK was operating under an alias and had been convicted of fraud in this District under another name. Had Victim-1 known about CHALK's true identity and prior conviction, or that CHALK was now operating under an alias as a result, Victim-1 would not have invested with CHALK. Upon learning of CHALK's identity and prior conviction, Victim-1 sent a note to CHALK, referencing him by both his alias and the name under which he had previously been convicted, which she believed would have the effect of letting CHALK know that she was aware of his criminal past. She received a written reply from Individual-1 via e-mail in which she was informed that she had previously agreed to invest her money with Greenlight for a minimum of ten years and therefore could not redeem her investment before then. Victim-1 did not make any agreement with Greenlight that would have limited her ability to redeem her investment in this way.[4] The written reply did not address the matter of CHALK's alias.

   f. Victim-1 continued to have telephone contact with other individuals she understood to be representatives of the Company. Not long after confronting CHALK using his real name, Victim-1 was informed by another Greenlight representative that CHALK was no longer investing her money in investment opportunities, as had been represented to Victim-1, but rather was using the money to pay employees, to cover the Company's operational expenses and CHALK's personal expenses, and to sponsor a minority networking conference program. At no point had Victim-1 been informed that her money would be used for any of these purposes, nor did she approve of the use of her money in those ways.

  8. I have listened to an audio recording of a coaching session provided by Victim-1 before Victim-1 invested.[5] Among

---

[4] The stock purchase agreements Victim-1 received with her investment are silent as to any ten-year prohibition on redemption.

[5] The coaching sessions were recorded by CHALK and made available for download by the clients.

other things, in that coaching session, TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, tells Victim-1 that if she invests in the Chairman's Investment Group,[6] she could get regular quarterly payments. He explains that the investment is an investment in the Company, and that she would receive stock in the Company, and that as an owner, she would receive dividends and stock certificates. CHALK also says on the recording that CHALK himself was invested in each of the opportunities involved in the Chairman's Fund, that one only needed to be a coaching client to invest, that there were no fees associated with the investment, and that every penny the clients sent in would go into the investment.

   9.   I have spoken to another investor in the Company ("Victim-2"). From my conversations with Victim-2, and from reviewing documents provided by Victim-2, I have learned, among other things, the following:

      a.   Victim-2 lives in Florida. After seeing TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, speak (as "Terrence Cash") at a minority networking conference program in or about 2017, Victim-2 was contacted by CHALK. In or around July 2018, Victim-2 paid CHALK for financial coaching sessions, and not long after, she purchased what she understood to be a bond from him for $10,000. For a time, Victim-2 received regular, quarterly $250 payments from that bond.

      b.   During the coaching sessions, CHALK spoke to Victim-2 about the Chairman's Fund. CHALK told her that he vetted the individual investment opportunities himself, and that if she invested her own money, she could expect a fixed, guaranteed rate of return, payable quarterly. CHALK said that the Company would keep any excess profit the investment made above and beyond guaranteed return. Initially, CHALK suggested that Victim-2 withdraw all of the money she had invested in a government pension fund and send that money to CHALK to invest in the Chairman's Fund. CHALK informed Victim-2 that other investors had liquidated their pension funds to invest in the Chairman's Fund. Instead of withdrawing money from her pension fund, Victim-2 sold a property she owned for approximately $87,000 and routed the money to Third Party Entity-1, as directed by CHALK. CHALK told Victim-2 that she was purchasing equity in the Company and that the money would go into investments CHALK had discussed with her, with a guaranteed, fixed, 12% rate of return applicable to her investment.

---

[6] I understand this to be the endeavor later known as the Chairman's Fund.

7

Victim-2 provided, and I have reviewed, stock certificates in the Company reflecting her receipt of eight shares. According to CHALK, and to proposal documents received by Victim-2 from the Company, she was to receive a guaranteed, fixed, annual return of 12%, paid to her on a quarterly basis via check.

   c. Victim-2 received a prorated initial payment in or around July 2018, a second payment in or about November 2018 (which was late), and a third payment in or about January 2019. These Chairman's Fund payments totaled approximately $5,800. After that, Victim-2 stopped receiving regular payments. She learned from other Company clients that they, too, were either receiving their payments late or not at all. In or about early 2020, Victim-2 contacted the Company and was told by a representative that checks would go out the next week. Contrary to that representation, Victim-2 did not receive any additional payments from the Company until in or about September 2020, when she unexpectedly received a quarterly payment check in the mail for approximately $2,400, dated April 24, 2020.

   d. In or about October 2019, the Company sent Victim-2 what it characterized as a contract and requested her signature. Among other things, the contract stated that she was an "accredited investor" with a net worth of over $250,000 who could afford to lose the entirety of her investment.[7] Victim-2 called Individual-1 and declined to sign the contract because, as Victim-2 explained to Individual-1, those statements were not true. Victim-2 also asked for her money back. Individual-1 informed Victim-2 that CHALK would not send anyone's money back.

   e. At all times, CHALK represented himself to Victim-2 as "Dr. Terrence Cash" and did not reveal his true identity or his criminal history.

  10. I have spoken to another investor in the Company ("Victim-3"), and reviewed bank documents and documents he received from the Company. From my conversations with Victim-3 and my review of those documents, I have learned the following:

   a. Victim-3 became a coaching client of TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, in or about July 2017. Before the first coaching session had ended, CHALK had mentioned the Chairman's Fund to him. CHALK again

---

[7] The term "accredited investor" is used by the SEC to refer to investors who are financially sophisticated and have a reduced need for the protection provided by regulatory disclosure filings.

represented himself to Victim-3 as "Dr. Terrence Cash" and did not reveal his true identity or his criminal history. CHALK described the Chairman's Fund as a group of companies under the "Greenlight banner" involved in private equity investments. CHALK later told Victim-3 that he could expect consistent, substantial returns of at least 12% -- but perhaps as high as 77% -- if he put his 401(k) money into the Chairman's Fund, and yet more if he invested his pension money as well. On or about December 26, 2017, Victim-3 wired CHALK approximately $209,000 in two wires from his 401(k) account. On or about May 14, 2018, Victim-3 wired CHALK approximately $557,000 from his pension. Victim-3 lost approximately $130,000 in the process because he withdrew the money from his pension ahead of schedule and absorbed financial penalties. CHALK assured Victim-3 that he would make his lost money back in a year. All of Victim-3's investments were wired through Third Party Entity-1.

      b.  Victim-3's first few payout checks grew in amount until he steadily received checks of approximately $27,000. This continued until the second quarter of 2019, but the payments became smaller. Victim-3 asked CHALK about the smaller payments, and CHALK told him that some expected contracts had fallen through. Victim-3 told him that he would accept checks at the 12% level until the Company was through its difficulties. From that point, Victim-3 received checks of approximately $23,000 in or about October 2019 and in or about February 2020 (approximately two months late). He then never received another check from the Company.

      c.  In or about late 2019, Victim-3 asked CHALK for his money back. CHALK told him that the investment could not be withdrawn for ten years. Victim-3 had not heard of or agreed to that condition, and confronted CHALK about it. CHALK attempted negotiate a resolution with Victim-3 in which Victim-3 would only receive a portion of his principal investment in the Company. Victim-3 cut off negotiations with CHALK. Later, CHALK told him that CHALK's lawyer had instructed him not to speak with investors anymore.

      d.  Victim-3 also spoke to Individual-1 in the course of trying to recoup his investment from the Company. Individual-1 told Victim-3 that she had just quit the business, and that she did not like the way that "CASH" was running it. She described CASH as "lying a lot" and a person of bad character.

      e.  Up until that point in or about late 2019, Victim-3 had only known CHALK as "Terrence Cash" or "Dr. Cash." At around this time, Victim-3 also learned CHALK's real name from another

investor. He looked CHALK up on the Internet and learned of his prior conviction. Victim-3 would never have invested with the Company had he known about CHALK's criminal history.

11. I have reviewed records of Third Party Entity-1, which includes a list of customers for which Third Party Entity-1 opened accounts in connection with the Company, and banking records. The list includes transactions between 2017 and 2020, including the investments of approximately 26 individuals, including Victim-1, Victim-2, and Victim-3, accounting for a total of approximately $4.8 million. I have separately run searches of the individuals listed in those records on databases available to law enforcement. From those searches, I am aware that the Company's clients also included clients who reside in Manhattan and the Bronx.

12. I have reviewed bank records, and an analysis of certain of those bank records, relating to the Company and its constituent entities, Third Party Entity-1, and transactions related to the investment activity referenced above. I have also reviewed documents that several Company clients, including Victim-1, Victim-2, and Victim-3, received from the Company via electronic mail. From my review of these materials, I have learned the following:

    a. The money transferred into Third Party Entity-1 was mostly then forwarded to one of two Company bank accounts (the "Company Recipient Accounts"), depending on the time that they were received.[8] Some of that combined money was, in turn, forwarded to several other Company bank accounts (together, the "Other Company Accounts"), for which I have reviewed bank records over the times relevant to this Complaint. From my review of the activity in the Company Recipient Accounts and the Other Company Accounts, there does not appear to be outgoing activity that matches the investments promised by the Company, either in destination or in denomination. Rather, in the aggregate, the money in the Company Recipient Accounts and Other Company Accounts -- which also received some funds from other sources, including what appears to be money from a cash advance company, business loan companies, and coaching fees paid to the

---

[8] During relevant periods of time applicable to each of the Company Recipient Accounts, those accounts also received money from other sources.

Company -- appears to have been used largely to make a combination of personal and business expenses.[9]

       b.    These personal and business expenses include, among others: (1) approximately $1,700,000 to pay bills for personal credit cards belonging to TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, and associates of his, including relatives of Individual-1, and to pay bills for business credit cards that, based on a review of records related to the credit card accounts, appear to be used substantially for personal expenses (including payments to a criminal defense attorney ("Personal Attorney-1")[10] in excess of $11,000 and a recurring payment totaling approximately $17,000 to an NBA basketball organization that, based on my training and general knowledge, appears to be for season ticket payments); (2) substantial direct payments to Personal Attorney-1 (approximately $57,500); (2) transfers of substantial amounts of money to an incarcerated prison inmate (approximately $22,600); (3) large purchases from a jewelry retailer (approximately $30,000); and (4) what appear to be car payments to a BMW luxury car dealer (approximately $74,000).

       c.    No account activity in the Company Recipient Accounts or the Other Company Accounts appears to correspond to the investments promised by the Company, in amount and destination. The transfers out of the various Greenlight accounts appear, on their face, to be wholly unrelated to investment activity. Despite raising more than $4 million from investors and promising to invest it in various ventures, CHALK

---

[9] The funds from Third Party Entity-1, which I understand to be investor funds, represent the majority of the approximately $7 million deposited into the Company Recipient Accounts and the Other Company Accounts between in or about 2017 and in or about 2020. Several of the Other Company Accounts either had a balance of zero or did not exist prior to receiving funds from the Company Recipient Accounts as mentioned above, and were used to make personal and business expense payments of the nature referenced here.

[10] I have spoken to a prosecutor at the Passaic County (NJ) Prosecutor's Office, who has informed me that Personal Attorney-1 represented CHALK in connection with recent unrelated felony charges, in a state criminal case that was resolved in or about July 2020.

appears to have invested no more than approximately $1.2 million, and potentially less than even that.[11]

WHEREFORE, the deponent prays that an arrest warrant be issued for TERRENCE CHALK, a/k/a "Terrence Cash," a/k/a "Dr. Cash," the defendant, and that CHALK be imprisoned or bailed as the case may be.

/s/ Kristin Allain/by SDA
_____
KRISTIN ALLAIN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
2nd day of November, 2020

_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

---

[11] The $1.2 million figure is a conservative estimate. Of the $1.2 million, approximately $929,800 constitutes transfers to entities known to have been at least discussed by CHALK with individual investors in the context of Company investments, according to my conversations with Company investors, including Victim-1. The remainder of the transfers (approximately $308,000) were to unknown entities.